1
2
3
4
5
6
7

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CURTIS LYNN COLLIER,

            Petitioner,                No. CIV S-07-0761 LKK CHS P

     vs.

JAMES TILTON, et al.,

            Respondents.        FINDINGS AND RECOMMENDATIONS

_____/

## I.  INTRODUCTION

Petitioner Curtis Collier, a state prisoner, proceeds through appointed counsel with a third amended petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. Collier attacks his conviction in the Yuba County Superior Court, case number CRF-01-723, for various methamphetamine related offenses.  Based on a thorough review of the record and applicable law, it is recommended that the petition be granted solely as to petitioner's claim that insufficient evidence supported the conviction for Count III, a violation of section 11366.5(a) of the California Health and Safety Code Section, and denied as to all remaining claims.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

The following statement of facts is taken from the unpublished opinion of the California Court of Appeal, Third District, on direct review of petitioner's convictions.  These

1

1  facts have not been rebutted with clear and convincing evidence and therefore are presumed

2  correct.  28 U.S.C. § 2254(e)(1); *Taylor v. Maddox*, 336 F.3d 992, 1000 (9th Cir. 2004).

> On July 11, 2001, Ted Smith and John Montoya, employees of
> Pacific Gas and Electric Company (PG & E), went to a house at
> 2777 Hooper Road to investigate possible power theft.  Service in
> the name of Langley and/or his spouse had been disconnected in
> May 2001 for nonpayment but was reportedly back on.  Montoya
> spoke with Langley who was outside working on a pickup.
> Langley identified himself, producing his California driver's
> license, and admitted living at the house.  Smith went to the meter,
> which was upside down and removed it, placing a security ring
> over the top of it to disconnect service.  Montoya noticed a black
> Camaro at the Hooper Road property, a car he had seen a few days
> earlier at 2386 Highway 20.
>
> On July 17, 2001, after Langley had not made payment to have
> service reconnected, Smith and Montoya returned to the Hooper
> Road property.  Upon arrival, a boat and trailer were parked at the
> house, which Smith and Montoya had seen at 2386 Highway 20.
> Smith and Montoya found that the security ring had been removed
> from the meter and battery cables had been connected to bypass the
> meter.  They noticed a very distinctive odor near the meter, which
> was located at the back of the house near an attached shed.  When
> Collier answered their knock on the front door, they noticed the
> same odor.
>
> After Smith and Montoya identified themselves, Collier identified
> himself.  They asked for identification and whether Collier was an
> occupant.  Collier denied that he lived there, refused to provide
> identification, became very agitated and started swearing upon
> learning they were with PG & E.  Smith and Montoya stated they
> would call law enforcement.  Collier said, "Go ahead. I want you to
> call law enforcement.  I'll explain to them what's going on."  After
> Smith and Montoya retreated to their vehicle, Montoya called for
> assistance from the Yuba County Sheriff's Department.  Collier
> repeatedly approached their vehicle and told them to "call the
> police."  While Smith and Montoya were waiting for law
> enforcement to arrive, Cal Sutton, Collier and possibly a third
> person (not Langley), tried to jump-start a car but were
> unsuccessful.  Sutton went back inside the house.
>
> Yuba County Deputy Sheriff Christopher Simpson arrived and
> spoke with Montoya.  Collier, no longer agitated, exited the house
> and approached, asking Deputy Simpson why he was there.  Collier
> denied living at the house and claimed he was only there working
> on a car.  After Deputy Wendell Anderson arrived, Deputy
> Simpson escorted Montoya and Smith to the meter located adjacent
> to a small shed and noticed a strong chemical odor he associated
> with methamphetamine labs.  Deputy Anderson went to the meter

and also noticed the strong chemical odor.  Because the deputies were told someone (Sutton) was in the house, the deputies knocked on the door but no one answered.  The door was locked so they forced entry into the residence by kicking the door.  Inside, the deputies smelled the same strong chemical odor that permeated the two-story house.  While searching for Sutton, Deputy Anderson noticed blister packs of cold pills and white powder on the kitchen counter and a can of acetone on top of the garbage can.  Deputy Anderson heard footsteps on the second floor.  Deputy Simpson found Sutton lying on a bed in an upstairs bedroom.  The three left the house.

A search warrant was obtained and members of the Yuba-Sutter Narcotic Enforcement Team (Net-5) searched the Hooper Road property, which included the two-story, three-bedroom house that had a strong chemical odor, a carport, an attached shed filled with smoke and another shed.  Both sheds had a strong chemical odor.  The search revealed numerous items associated with the manufacture of methamphetamine.

In the kitchen in the house, officers found: pieces of aluminum foil, one with an off-white powder substance, a pile of off-white powder, a plate with white powder residue and a blister pack of red pills or pseudoephedrine on the counter, several glass beakers, funnels and other glassware in the sink, an empty can of acetone in the wastebasket, other powder substances and a coffee filter with residue in a cabinet, a coffee grinder next to a bowl with a white milky residue, and a bag of tan- and a bag of pink-colored substances in a closed cupboard above the stove.

In the downstairs bedroom, officers found a condensing column in plain view on a shelf in the closet.

In the upstairs southwest bedroom, officers found a letter dated April 28, 2001, addressed to Langley at the Hooper Road property, a line of white powder, a pen, a lighter and an ashtray on the dresser, a butane torch next to the bed, and a glass pipe and plastic baggie with an off-white powder substance under the sheets.
In the upstairs northeast bedroom, officers found three envelopes and two PG & E bills addressed to Collier at 2386 Highway 20 on a shelf in the closet, lots of clothing on the floor, a few items of clothing in the closet, and a mattress on the floor.

In the carport, officers found two propane tanks modified to be used as hydrochloric acid gas generators.

In the attached shed, which was padlocked, officers found a bucket with amber liquid, a water bottle with a dark liquid, a strainer, a can of organic solvent, coffee filters, aluminum foil, a fan, a modified propane tank, a glass pan with white powder residue, a gallon jug with a dark substance, plastic tubing, a glass jar, Red

3

Devil Lye, rock salt, and organic solvent containers.  No key to the padlock on the attached shed was found on Collier.

In the other shed, officers found an acetone can, a plastic bucket with a funnel, Red Devil Lye, muriatic acid, aluminum foil, cans of organic solvent, a 12-liter flask, a baggie of red powder, beakers, tubing, condenser columns, a separatory funnel, iodine crystals used in the hydriodic-acid-ephedrine-production method, a coffee grinder, and a box of Ziploc plastic baggies.

Officers did not find any scales, pay/owe sheets, a cutting agent or receipts or records for the boxes of pseudoephedrine, red phosphorus, iodine or condensing columns found on the premises.

An expert analyzed several samples and found methamphetamine at various stages.  He explained how methamphetamine is produced with cold tablets, the use of the other items found at the Hooper Road property and the odors of a methamphetamine lab. Specifically, the expert analyzed four and one-half gallons of a bilayered solution containing methamphetamine, an intermediate step in the manufacturing process, 170.5 grams net weight of a chunky, pink substance containing an ephedrine or pseudoephedrine with triprolidine, and 8.85 grams net weight of methamphetamine.[FN]

> FN. The expert also analyzed a tan-colored substance that contained an ephedrine or triprolidine (exh. 69-C), but was not asked on the record about its weight.  In closing argument, the prosecutor referred to both exhibits 69-B and 69-C, the exhibits containing the pink- and tan-colored substances of ephedrine, respectively.  The prosecutor commented that one weighed 170.5 grams and the other weighed 127.1 grams, totaling 297.6 grams of a substance containing ephedrine.

A neighbor had seen a lot of traffic going in and out of Langley's house on a regular basis after Langley's spouse moved out two or three months before the search and had heard Langley's voice on a daily basis since then.  Another neighbor had seen Collier at the Hooper Road property two or three times a week.

California Highway Patrol Net-5 Agent Larren Nelson testified that at about 2:20 p.m. on July 17, 2001, he interviewed Collier who was seated in the rear of a deputy sheriff's patrol car.  Having waived his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436, Collier explained that he had lost his home on Highway 20, had been living with Langley at the Hooper Road property for approximately two weeks and planned to live with Langley long enough to get his own place.  Agent Nelson further testified that Collier denied knowing anything about a methamphetamine lab, claiming he had not used methamphetamine for some time.

4

On July 22, 2001, when Langley was stopped for a vehicle infraction by a Marysville police officer, he claimed his name was "Chuck Seaton" but had no identification. A record check on the name failed to provide a match and Langley was arrested. The officer found a $5 bill rolled up with 0.99 grams of methamphetamine on [Langley]'s person and Langley's wallet and driver's license in the car. While in the patrol car, Langley broke a window and claimed to be having a seizure.

Neither defendant testified. In his defense, Collier recalled Deputy Anderson to testify. Deputy Anderson interviewed Collier at about noon on July 17, 2001. Deputy Anderson testified that Collier claimed he did not live at the Hooper Road property but did not specifically say where he was residing.

*People v. Curtis Byron Langley*, et al., No. C041733, slip op. at 4-10, (Ca. Ct. of App., Third App. District July 20, 2005).

On March 26, 2002, a jury found Collier guilty of manufacturing methamphetamine that exceeded three gallons of liquid by volume, possession of methamphetamine for sale, maintaining a place for production of methamphetamine and possession of ephedrine or pseudoephedrine with intent to manufacture methamphetamine. (Reporter's Transcripts ("RT") at 622-27.) On June 24, 2002 the trial judge sentenced Collier to a term of 18 years in prison. (RT at 671.)

On July 19, 2005, the California Court of Appeal affirmed the judgment but remanded the matter back to the trial court for re-sentencing of a one-year enhancement. *People v. Langley*, et al., *supra*, slip op. at 20. Collier then filed a petition for review in the California Supreme Court. That petition was summarily denied on September 30, 2005.

After re-sentencing, Collier filed a petition for writ of habeas corpus in the Yuba County Superior Court. That petition was denied without prejudice on December 19, 2006. Collier filed a second petition in the Yuba County Superior Court. That petition was denied on April 30, 2007.

On May 25, 2007, Collier filed a petition for writ of habeas corpus in the California Court of Appeal. That petition was denied on August 16, 2007. On September 25,

2007, Collier filed a habeas petition in the California Supreme Court.  Before that petition was decided, Collier filed a second petition in the California Supreme Court on November 30, 2007. The California Supreme Court denied both petitions on March 19, 2008, in separate summary decisions.

### III.  CLAIMS PRESENTED

Collier's third amended petition raises three claims:[1]

A.  There is insufficient evidence that petitioner possessed methamphetamine for sale, possessed ephedrine, manufactured meth., or had control of the space where meth. was manufactured;

B.  Petitioner received ineffective assistance of trial and appellate counsel; and

C.  Petitioner was denied his rights guaranteed by the Fifth, Sixth, and Fourteenth Amendments because he was sentenced based on findings not proven to a jury beyond a reasonable doubt.

### IV.  APPLICABLE STANDARD FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (*citing Engle v. Isaac*, 456 U.S. 107, 119 (1982)). This petition for writ of habeas corpus is also subject to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999).  Under AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[1] Claims A and C are recited verbatim.  Claim B, however, is the amalgamation of Collier's twelve individual issues with the performance of his trial and appellate counsel.

6

1       (2) resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in the
2       State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v.*

*Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

This court looks to the last reasoned state court decision in determining whether the law applied

to a particular claim by the state courts was contrary to the law set forth in the cases of the United

States Supreme Court or whether an unreasonable application of such law has occurred. *Avila v.*

*Galaza*, 297 F.3d 911, 918 (9th Cir. 2002), *cert. dismissed*, 538 U.S. 919 (2003). It is the habeas

corpus petitioner's burden to show the state court's decision was either contrary to or an

unreasonable application of federal law. *Woodford v. Visciotti*, 537 U.S. 19, 123 S. Ct. 357, 360

(2002).

## V.  DISCUSSION OF PETITIONER'S CLAIMS

    A.     Insufficient Evidence

         1)     Description of Claim

        Collier contends that insufficient evidence supports his convictions. He argues

that it was his co-defendant, Curtis Langley, who was the owner of the property and that the only

evidence linking Collier to the crime was his presence at the scene, the presence of some of his

mail in a bedroom, and his admission that he was temporarily staying with the owner of the

property. Collier also cites numerous facts that allegedly demonstrate his innocence, such as that

no key to the shed housing the manufacturing equipment were found on him and that his

fingerprints were not found on any of the manufacturing equipment.

         2)     State Court Opinion

        In the last reasoned state court opinion, the California Court of Appeal rejected

this claim on direct review:

       By his own admission to Agent Nelson, Collier had lived at
Langley's residence for two weeks during which there were
numerous visitors and he planned to continue living at the

7

residence until he got his own place.  Collier's belongings were found in the upstairs northeast bedroom.  On July 11, 2001, at the Hooper Road property, PG & E employee Montoya saw a black Camaro, which he had seen a few days earlier at Collier's previous Highway 20 residence.  On July 17, at the Hooper Road property, the PG & E employees saw a boat and trailer that they had seen at Collier's previous Highway 20 residence.  Collier opened the door on July 17 when PG & E employees knocked.  The employees detected a stinky odor from inside.  The employees detected the same odor near the meter located at the back of the house near the shed.  With Sutton's help, Collier tried to start a car before law enforcement arrived.  When sheriff's deputies arrived, they detected the same chemical odor and recognized it as one associated with manufacturing methamphetamine.  The odor was detected throughout the house as well as in both sheds, one of which was filled with smoke.  Officers found four and one-half gallons of a solvent containing methamphetamine, at least 170.5 grams of a substance containing an ephedrine or pseudoephedrine, and 8.85 grams of methamphetamine.  There was substantial evidence that the manufacturers intended to sell or distribute methamphetamine despite the lack of scales or pay/owe sheets. Items associated with the manufacture of methamphetamine were found all over the property including the kitchen counter or the kitchen sink.  Collier was a resident of the house and exercised at least joint dominion and control over the common areas of the house, including the kitchen...  The jury could reasonably infer that Collier manufactured methamphetamine, knew that the methamphetamine manufactured and to be manufactured was with the intent to sell or distribute to others, that Collier jointly controlled the premises with Langley and knowingly made the premises available to manufacture methamphetamine for sale or distribution, and that Collier possessed ephedrine or pseudoephedrine with the intent to manufacture methamphetamine. Sufficient evidence supports his conviction on all counts.

*People v. Langley*, et al., *supra*, slip op. at 12-13.

3)      Applicable Law

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970). Sufficient evidence supports a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  "[T]he

1    dispositive question under *Jackson* is 'whether the record evidence could reasonably support a

2    finding of guilt beyond a reasonable doubt.'" *Chein v. Shumsky*, 373 F.3d 978, 982 (9th Cir.

3    2004) (quoting *Jackson*, 443 U.S. at 318). "A petitioner for a federal writ of habeas corpus faces

4    a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction

5    on federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). In order

6    to grant the writ, the federal habeas court must find that the decision of the state court reflected

7    an objectively unreasonable application of *Jackson* and *Winship* to the facts of the case. *Id*. at

8    1275.

9          The court must review the entire record when the sufficiency of the evidence is

10   challenged in habeas proceedings. *Adamson v. Ricketts*, 758 F.2d 441, 448 n.11 (9th Cir. 1985),

11   *vacated on other grounds*, 789 F.2d 722 (9th Cir. 1986) (en banc), *rev'd*, 483 U.S. 1 (1987). It is

12   the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw

13   reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. If the trier of

14   fact could draw conflicting inferences from the evidence, the court in its review will assign the

15   inference that favors conviction. *McMillan v. Gomez*, 19 F.3d 465, 469 (9th Cir. 1994). The

16   relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether

17   the jury could reasonably arrive at its verdict. *United States v. Mares*, 940 F.2d 455, 458 (9th

18   Cir. 1991). Thus, "[t]he question is not whether we are personally convinced beyond a

19   reasonable doubt" but rather "whether rational jurors could reach the conclusion that these jurors

20   reached." *Roehler v. Borg*, 945 F.2d 303, 306 (9th Cir. 1991). The federal habeas court

21   determines sufficiency of the evidence in reference to the substantive elements of the criminal

22   offense as defined by state law. *Jackson*, 443 U.S. at 324 n.16; *Chein*, 373 F.3d at 983.

23          Superimposed on these already stringent insufficiency standards is the AEDPA

24   requirement that even if a federal court were to initially find on its own that no reasonable jury

25   should have arrived at its conclusion, the federal court must also determine that the state

26   appellate court not have affirmed the verdict under the *Jackson* standard in the absence of an

9

1   unreasonable determination. *Juan H. v. Allen*, 408 F.3d 1262 (9th Cir. 2005).

2           4)      Discussion

3           Collier was convicted of violating California Health and Safety Code sections

4   11379.6(a), 11378, 11383(c)(1), and 11366.5(a).

5               a)      Count I (Violation of Section 11379.6(a))

6           Under California Health and Safety Code section 11379.6(a):

7           [E]very person who manufactures, compounds, converts, produces,
            derives, processes, or prepares, either directly or indirectly by
8           chemical extraction or independently by means of chemical
            synthesis [methamphetamine] . . . shall be punished.
9

10  CAL. HEALTH & SAFETY CODE §11379.6(a).

11          At trial, the jury heard testimony that there was "a strong chemical odor" inside

12  the 2777 Hooper Road residence.  (RT at 159.)  The odor was noticeable throughout the bottom

13  floor of the residence.  (RT at 350.)  A condensing column was found in a downstairs bedroom.

14  (RT at 243.)  In the kitchen sink were a coffee grinder, a funnel, a glass beaker, a glass jar, and a

15  one gallon can of acetone.  (RT at 244.)  A box of muriatic acid was found somewhere in the

16  residence, possibly the kitchen.  (RT at 245.)  In the north shed there were numerous items used

17  in the manufacturing of methamphetamine, including a propane tank converted for use as

18  hydrochloric acid generator, a gallon of muriatic acid, Traileez iodine crystals, numerous beakers,

19  funnels and containers.  (RT at 238-44.)  Also found in that shed was four and a half gallons of a

20  solvent containing methamphetamine.  (RT at 428.)

21          The jury also heard testimony that Collier answered the door when PG&E

22  employees arrived at the residence.  (RT at 64.)  Mail addressed to Collier at his Highway 20

23  residence was found in an upstairs bedroom.  (RT at 294.)  Finally, Agent Nelson testified that

24  Collier told him he "had been living [at the residence] for approximately two weeks" and was

25  staying there "long enough to get back on his feet and to get his own place again."  (RT at 248.)

26  /////

                                            10

1    Though Collier argues there was insufficient evidence that he had possession of

2    any of contraband, under California law, possession of contraband "may be imputed when the

3    contraband is found in a place which is immediately and exclusively accessible to the accused

4    and subject to his dominion and control, or to the joint dominion and control of the accused and

5    another." _People v. Jenkins_, 91 Cal.App.3d 579, 583 (1979).  Collier cannot dispute that, at least

6    at the time of his arrest, he had access to the interior of the residence.  Found inside that

7    residence were items including a condensing column, a coffee grinder, a funnel, a glass beaker, a

8    glass jar, and a one gallon can of acetone.  Moreover there was a strong chemical odor

9    permeating the home.  A rational juror could have concluded, based on the presence of

10   contraband, the presence of the odor and Collier's admission that he was residing at the location,

11   that Collier was aware of the presence of the chemicals, had access to them, and was involved in

12   the manufacture of methamphetamine.

13        Presented with this evidence rational jurors could reach the conclusion that Collier

14   was guilty of violating section 11379.6(a).  Thus as to this count, the state court's rejection of the

15   insufficient evidence claim was neither contrary to, nor an unreasonable application of, clearly

16   established Supreme Court precedent and Collier is not entitled to relief on this claim.

17                    b)    Count II Violation of Section 11378

18        Under California Health and Safety Code section 11378, "every person who

19   possesses for sale any controlled substance. . . ." shall be punished. CAL. HEALTH & SAFETY

20   CODE § 11378.  Under California law:

21        The essential elements of possession of a controlled substance are
          dominion and control of the substance in a quantity usable for
22        consumption or sale, with knowledge of its presence and of its
          restricted dangerous drug character.  Each of these elements may
23        be established circumstantially.

24   _People v. Palaschak_, 9 Cal.4th 1236, 1242 (Cal. 1995) (quotations omitted) (citations omitted).

25   "Exclusive possession of the premises is not necessary nor is physical possession of the drug of

26   the essence."  _People v. Flores_, 155 Cal.App.2d 347, 349 (1957).  Evidence may also include the

11

1   testimony of experienced officers that in their opinion the controlled substance was held for

2   purposes of sale based upon the quantity, packaging and normal use of an individual.  *People v.*

3   *Harris*, 83 Cal.App.4th 371, 374-375 (2000).

4           In addition to the testimony previously cited, the jury also head testimony that

5   8.85 grams of methamphetamine were found on the property.  (RT at 438-39.)  Agent Nelson

6   testified that in his opinion the methamphetamine found at the residence was possessed for sale.

7   (RT at 456-57.)  Collier argues that his conviction was based on his mere presence at the

8   residence and cites *People v. Jenkins*, 91 Cal.App.3d 579, 581-87 (1979), for the proposition that

9   mere presence is insufficient to prove possession.

10          In *People v. Jenkins*, the California Court of Appeal reversed the defendant's

11  conviction for possession and manufacturing of phencyclidine ("PCP") based on the defendant's

12  mere presence at his brother's home where the PCP was found.  91 Cal.App.3d at 581-87.  The

13  *Jenkins* court held, in part, that when the contraband at issue "is located at premises other than

14  those of the defendant, dominion and control may not be inferred solely from the fact of

15  defendant's presence, even where the evidence shows knowledge of the presence of the drug and

16  of its narcotic character."  *Id*. at 584.  Unlike the situation in *Jenkins*, however, here the jury

17  could have reasonably found that Collier was residing at the Hooper Road property.

18          Collier answered the door when the two PG&E employees knocked.  Three

19  envelopes and two PG&E bills addressed to Collier's Highway 20 address where found in an

20  upstairs bedroom.  Perhaps most significantly, Agent Nelson testified that Collier informed him

21  that Collier had been living at the residence for two weeks.  The *Jenkins* court observed:

22          The inference of dominion and control is easily made when the
            contraband is discovered in a place over which the defendant has
23          general dominion and control: his residence [], his automobile [],
            or his personal effects [].
24

25  *Jenkins*, 91 Cal.App.3d at 584 (citations omitted).

26  /////

                                                12

1    Collier's jury was presented with evidence that he acknowledged living on the

2    property where methamphetamine was found in a quantity that an experienced officer testified

3    was held for purposes of sale.  Inside the residence there were numerous items necessary to the

4    manufacturing of methamphetamine as well as a strong chemical odor.  Based on this evidence a

5    rational juror could conclude that Collier exercised dominion and control over methamphetamine

6    for sale with knowledge of its presence and of its restricted dangerous drug character.

7    Presented with this evidence, rational jurors could have reached the conclusion

8    that Collier was guilty of violating section 11378.  Thus, as to this count, the state court's

9    rejection of the insufficient evidence claim was neither contrary to, nor an unreasonable

10   application of, clearly established Supreme Court precedent and Collier is not entitled to relief

11   for this claim.

12                    c)        Count IV Violation of Section 11383(c)(1)[2]

13   Under California Health and Safety Code section 11383, subdivision (c)(1),

14   operative at the time of Collier's conviction, "[a]ny person who, with intent to manufacture

15   methamphetamine or any of its analogs. . . possesses ephedrine or pseudoephedrine. . . is guilty

16   of a felony and shall be punished. . ." CAL. HEALTH & SAFETY CODE § 11383 (c)(1).

17   Collier's jury heard testimony that 297.6 grams of ephedrine, the equivalent of

18   approximately 9,920 thirty milligram Sudafed tablets, were discovered along with other

19   chemicals and items consistent with the manufacturing methamphetamine.  (RT at 434-35, 561.)

20   As already discussed, the jury could reasonably infer that Collier exercised dominion and control

21   over the ephedrine based on his answering the door, the presence of his mail and his statement to

22   Agent Nelson that he was staying at the residence.

23   Presented with this evidence, rational jurors could reach the conclusion that

24   Collier was guilty of violating section 11383(c)(1).  Thus, as to this count, the state court's

25

26          [2] Count III will addressed last because of its unique disposition.

13

1   rejection of the insufficient evidence claim was neither contrary to, nor an unreasonable

2   application of, clearly established constitutional law and Collier is not entitled to relief for this

3   claim.

4        d)  Count III Violation of Section 11366.5(a)

5      Under California Health and Safety Code section 11366.5(a):

6       Any person who has under his or her management or control any
    building, room, space, or enclosure, either as an owner, lessee,

7       agent, employee, or mortgagee, who knowingly rents, leases, or
    makes available for use, with or without compensation, the

8       building, room, space, or enclosure for the purpose of unlawfully
    manufacturing, storing, or distributing any controlled substance for

9       sale or distribution shall be punished . . .

10   CAL. HEALTH & SAFETY CODE § 11366.5(a).

11      "To convict under section 11366.5 the prosecution must prove: (1) the accused

12   knowingly permitted a controlled substance to be manufactured or stored; (2) for the purpose of

13   sale or distribution to others; (3) in a building under his or her management or control." *People*

14   *v. Sanchez*, 27 Cal.App.4th 918, 923 (1994).  "[V]iolation of this statute requires that the

15   property owner or manager be proven to have allowed a third party use of the property for

16   manufacturing, storing, or distributing a controlled substance."  *People v. Dillon*, 156

17   Cal.App.4th 1037, 1045 (2007).

18      The evidence linking Collier to the residence consisted of:

19      Testimony that a neighbor to the Hooper Road property saw
   Collier at the residence "two or three times a week."  (RT at 118.)

20

21      Testimony that on July 11, a witness saw a black Camaro at the
   Hooper Road property that he had seen a few days earlier at
   Collier's Highway 20 residence.  (RT at 96.)

22

23      Testimony that on July 17, a witness saw a boat and "other
   materials" at the Hooper Road property that he had seen a few days
   earlier at Collier's Highway 20 residence.  (RT at 104.)

24

25      Testimony that on July 17, Collier answered the door of the
   Hooper Road property.  (RT at 89.)

26      /////

1        Testimony that Collier told Agent Nelson that he "had been living
      [at the residence] for approximately two weeks" and was staying

2        there "long enough to get back on his feet and to get his own place
      again."  (RT at 248.)

3

      Testimony that mail addressed to Collier at his Highway 20

4        residence was found in an upstairs bedroom.  (RT at 294.)

5  Based on this evidence the prosecutor argued that, though Langley was the owner of record for

6  the Hooper Road property, Collier was "a lessee."  (RT at 570.)

7        The jury also heard testimony that Langley had lived at the Hooper Road property

8  for approximately six months to a year prior to the July 17 incident, that he was the owner of the

9  home, and that the electric service for that property was in his name. (RT at 106, 115, 570.)

10  Based on all the totality of evidence viewed in the light most favorable to the prosecution, the

11  most that a reasonable juror could have concluded was that Collier was staying at the Hooper

12  Road residence.  A reasonable juror could not conclude that the relationship between Collier,

13  Langley and the property was one in which Collier could be convicted under section 11366.5(a).

14        The customary meanings of "the active verbs used in section 11366.5, subdivision

15  (a)–'rent,' 'lease,' and 'make available'--contemplate a transaction between two parties: the

16  person(s) with authority to determine the property's use and the person(s) without authority who

17  seeks to use the property."  *Dillon*, 156 Cal.App.4th at 1044.

18        In *Dillon*, the California Court of Appeal reversed a defendant's conviction under

19  section 1366.5, based on cultivation of marijuana, where the defendant was the property owner.

20  *Dillon*, 156 Cal.App.4th at 1047.  The court there held that:

21        violation of this statute requires that the property owner or manager
      be proven to have allowed a third party use of the property for

22        manufacturing, storing, or distributing a controlled substance.
      There is no violation if the person(s) who controls the property is

23        the only one using it to manufacture the controlled substance.

24  *Id*. at 1045.  In response to the people's argument that the court should consider the statute's

25  legislative history, the *Dillon* court held the that court need only examine legislative history when

26  a statute is ambiguous and that section 11366.5 "is not ambiguous as to its requirement that the

1    defendant must have made his or her property available to another person to use for

2    manufacture." *Id*. at 1047. Nevertheless, examination of the legislative history revealed that the

3    purpose of section 11366.5:

4           was [ ] to punish those who aid or enable other people to
            manufacture controlled substances by providing the necessities for
5           manufacture: space, devices, and raw ingredients.

6    *Id.*

7           Evidence at trial established that Langley was the owner and primary resident of

8    the Hooper Road property long before Collier arrived.  While the jury could have reasonable

9    inferred that Collier was staying there, there was no evidence to support a conclusion that the

10   relationship between Collier, Langley and the Hooper Road property was such that it could be

11   said that the property was under Collier's management or control, or that Collier aided or enabled

12   the production of a controlled substance by making the property available to Langley, as the

13   evidence demonstrated it was Langley who was in fact making the property available to Collier.

14          Review of the entire record reveals that rational jurors could not reach the

15   conclusion that Collier was guilty of violating section 11366.5(a).  Thus, conviction on this count

16   violated Collier's right to due process.  Moreover, the conclusion by the California Court of

17   Appeal that the jury could reasonably infer that Collier jointly controlled the premises with

18   Langley and knowingly made the premises available to manufacture methamphetamine for sale

19   or distribution was an unreasonable determination of the facts in light of the evidence presented

20   at Collier's trial.  Collier's petition should be granted as to this claim.

21          B.      Ineffective Assistance of Counsel

22                  1)      Description of Claim[3]

23   _____

24          [3] Collier's third amended petition contains twelve specific claims of ineffective assistance
     of counsel.  "Ground 2" in the third amended petition consists of sixteen separate allegations of
25   ineffective assistance of counsel, most of which Collier later recites in separate detailed claims,
     but none of which are explained in detail in Ground 2.  Those allegations found in Ground 2 are
26   vague and conclusory and should be rejected on that basis.  *See Jones v. Gomez*, 66 F.3d 199,
     204 (9th Cir. 1995) (quoting *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994)) ("'[c]onclusory

1    Collier argues that his trial counsel was ineffective in failing to conduct pre-trial

2    investigation, failing to move for a severance, failing to interview potential defense witnesses,

3    failing to call expert witnesses, failing to utilize independent testing, failing to bring certain

4    motions, and failing to make certain objections.  He also argues that his appellate counsel was

5    ineffective for failing to raise his trial counsel's ineffectiveness on appeal.  Respondent asserts,

6    however, that review of petitioner's entire ineffective assistance of counsel claim is barred by

7    procedural default because Collier's California State Supreme Court petition containing these

8    claims was summarily denied with a citation to *In re Robbins*, 18 Cal.4th 770, 780 (1998),

9    indicating that the petition was untimely.  *See Id.* (holding that a prisoner must seek habeas

10   corpus relief from California courts without "substantial delay").

11          2)      Procedural Default

12   Federal courts will generally not review a question of federal law decided by a

13   state court if its decision rests on a state law ground that is independent of the federal question

14   and adequate to support the judgment.  *Coleman v. Thompson,* 501 U.S. 722, 750 (1991).  "The

15   state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to

16   adjudication of the claim on the merits."  *Walker v. Martin*,131 S.Ct. 1120, 1127 (2011), (citing

17   *Wainwright v. Sykes*, 433 U.S. 72, 81-82, 90 (1977)).  For a state law ground to be independent,

18   the basis for the decision must not be interwoven with federal law.  *LaCrosse v. Kernan,* 244

19   F.3d 702, 704 (9th Cir. 2001).  To be deemed adequate, it must be "firmly established" and

20   "regularly followed."  *Beard v. Kindler*, 130 S.Ct. 612, 617 (2009) (quoting *Coleman*, 501 U.S.

21   at 729); *Poland v. Stewart,* 169 F.3d 575, 577 (9th Cir. 1999).

22          Once the state has pleaded the existence of an independent and adequate state

23   procedural ground as an affirmative defense, as it has done in this case, the burden shifts to

24

25   allegations which are not supported by a statement of specific facts do not warrant habeas
     relief'").  Grounds Three through Thirteen however are supported by specific facts.  Because
26   those grounds all concern the ineffective assistance of counsel they will be analyzed together as
     one claim.

1  petitioner to place that defense in issue.  *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003).

2  Here, Collier contested the adequacy of this rule in his *pro se* traverse filed on January 21, 2009;

3  his appointed counsel likewise contested the adequacy of the rule in the brief filed on September

4  16, 2010.  Thus, the burden shifts back to the state, which bears the "ultimate burden of proving

5  the adequacy" of the relied-upon ground.  *Id*.

6          An exception to the general rule of procedural bar exists if the prisoner can

7  demonstrate either cause for the default and actual prejudice as a result of the alleged violation of

8  federal law, or that failure to consider the claims will result in a fundamental miscarriage of

9  justice.  *Coleman*, 501 U.S. at 750; *see also Sykes*, 433 U.S. at 84-85.

10          Here, respondent meets the burden of demonstrating procedural default.  The

11  Ninth Circuit has recognized that the application of California's timeliness rule "became

12  independent of federal law in 1998."  *Townsend v. Knowles*, 562 F.3d 1200, 1206 (9th Cir. 2009)

13  (citing *Bennett*, 322 F.3d at 582-83) (abrogated on other grounds in *Walker v. Martin*,131 S.Ct.

14  1120).  In addition, the United States Supreme Court recently held on habeas corpus that the rule,

15  though discretionary in application, was adequate because it was both "firmly established" and

16  "regularly followed."  *Walker v. Martin*, 131 S.Ct. at 1128-29.

17          In *Walker v. Martin*, the Supreme Court found "no inadequacy in California's

18  timeliness rule generally or as applied in Martin's case."  *Id*. at 1131.  In so finding, the Court

19  stressed that Martin did "not allege[ ] that California's time bar, either by design or in operation,

20  discriminates against federal claims or claimants."  *Id*. at 1125.  The decision "le[ft] unaltered

21  this Court's repeated recognition that federal courts must carefully examine state procedural

22  requirements to ensure that they do not operate to discriminate against claims of federal rights."

23  *Id*. at 1131 (citing *Brown v. Western R. Co. of Ala.*, 338 U.S. 294, 298-99 (1949); *see also*

24  *Kindler*, 130 S.Ct. at 620 (Kennedy, J., concurring) (a state procedural ground would be

25  inadequate if the challenger shows a "purpose or pattern to evade constitutional guarantees").

26  /////

18

Here, as in *Martin v. Walker*, there appears no basis for concluding that the procedural rule operated with a purpose to disadvantage petitioner's attempt to assert federal rights.  Petitioner also fails to demonstrate cause for his procedural default in state court, or that failure to consider the claims will result in a fundamental miscarriage of justice.  Accordingly, the procedural rule imposed by the state of California to bar petitioner's claims should be found independent and adequate to support to support the state court judgment.  *Walker v. Martin*, 131 S.Ct. at 1128-29.[4]  Such a finding operates to bar all of petitioner's ineffective assistance of counsel claims in this court.

C.     Sentence

1)     Description of Claim

Collier contends that the trial judge imposed the upper term sentence on Count I after finding that Collier possessed a large quantity of contraband, specifically ephedrine.  Collier argues his sentence violates the rule of *Cunningham v. California*, 549 U.S. 270 (2007) and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), because it was increased beyond the statutory maximum based on facts not found true by the jury.

2)     State Court Opinion

In rejecting this claim, the California Court of Appeal held:

Relying on Apprendi and Blakely, Langley and Collier claim the
trial court was not authorized to impose the upper term on count I

---

[4] In *Walker v. Martin*, the Supreme Court did not expressly overrule *Townsend*, 562 F.3d at 1207-1208, in which the Ninth Circuit previously held that California's timeliness rule was "too uncertain" to constitute an independent and adequate state ground to bar habeas corpus relief under the procedural default rule.  Rather, the Supreme Court referenced the Ninth Circuit's decision in that case (*see Walker v. Martin*, 131 S.Ct. at 1127) but nonetheless determined California's timeliness rule was sufficiently clear.
    When circuit authority is overruled by the Supreme court, a district court is no longer bound by that authority, and need not wait until the authority is expressly overruled.  *See Miller v. Gammie*, 335 F.3d 889, 899-900 (9th Cir. 2003) (en banc).  Furthermore, "circuit precedent, authoritative at the time it was issued, can be effectively overruled by subsequent Supreme Court decisions that 'are closely on point,' even though those decisions do not expressly overrule the prior circuit precedent."  *Miller*, 335 F.3d at 899 (quoting *Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1123 (9th Cir. 2002)).

1

2

3

> because the court relied upon facts not submitted to the jury and proved beyond a reasonable doubt, thus depriving them of the constitutional right to a jury trial on facts legally essential to the sentence.
>
> However, for reasons set forth in its recent opinion, the California Supreme Court has held "the judicial fact finding that occurs when a judge exercises discretion to impose an upper term sentence or consecutive terms under California law" does "not violate a defendant's right to a jury trial under the principles set forth in Apprendi, Blakely, and Booker." (Black, supra, 35 Cal.4th at pp. 1244, 1254.)
>
> We must follow the holding in Black, supra, 35 Cal.4th 1238, which is binding on us.  (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455.)  Accordingly, we reject defendants' claim of sentencing error based on Blakely.

4

5

6

7

8

9

10 *People v. Langley*, et al., *supra*, slip op. at 28-29.

11         3)      Applicable Law

12         In *Apprendi v. New Jersey*, the Supreme Court held "[A]ny fact that increases the

13 penalty for a crime *beyond the prescribed statutory maximum* must be submitted to jury, and

14 proved beyond a reasonable doubt." 530 U.S. 466, 490 (2000) (emphasis added).  In *Blakely v.*

15 *Washington*, the Supreme Court explained that the "statutory maximum" for *Apprendi* purposes

16 is the "maximum" sentence a judge may impose solely on the basis of facts reflected in the jury

17 verdict or admitted by the defendant. 542 U.S. 296, 303 (2004).  In other words, the relevant

18 statutory maximum "is not the maximum sentence a judge may impose after finding additional

19 facts, but the maximum he may impose without any additional facts." *Id.* at 303-304.

20         In *People v. Black*, the California Supreme Court held that California's

21 Determinative Sentencing Law satisfied federal constitutional law and did not implicate the rules

22 of *Apprendi* and *Blakely*.  *People v. Black* (*Black I*), 35 Cal.4th 1238, 1253 (2005).

23 Subsequently, however, in *Cunningham v. California*, 549 U.S. 270 (2007), the Supreme Court

24 overruled the California Supreme Court's ruling in *Black I*.  The Supreme Court held that the

25 middle term of California's determinate sentencing law was the relevant statutory maximum for

26 the purpose of applying the rule of *Blakely* and *Apprendi*.  *Cunningham*, 549 U.S. at 293.

4)      Discussion

The California Court of Appeal's reliance on *Black I* in upholding the imposition of the upper term without a trial by jury was indeed contrary to then-existing United States Supreme Court precedent. *See Butler v. Curry*, 528 F.3d 624, 640-641 (9th Cir. 2008) (finding that the California Supreme Court's decision in *Black* was contrary to then clearly established Supreme Court precedent).

The last question to consider is whether the error was harmless, as error under *Apprendi* and its progeny is subject to harmless error analysis. *Washington v. Recuenco*, 548 U.S. 212, 218 (2006). Applying *Brecht v. Abrahamson*, this court must determine whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *See also Hoffman v. Arave*, 236 F.3d 523, 540 (9th Cir. 2001). Under that standard, relief must be granted if there exists "grave doubt" as to whether a jury would have found the relevant aggravating factors beyond a reasonable doubt. *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). Grave doubt exists when, "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Id*. at 435.

Under California law, only one aggravating factor is necessary to set the upper term as the maximum term. *See* Cal. R. Ct. 4.420; *People v. Cruz*, 38 Cal.App.4th 427, 433 (2nd Dist. 1995); *People v. Forster*, 29 Cal.App.4th 1746, 1758 (4th Dist. 1994). The sentencing error will therefore be found harmless if it is not prejudicial as to just one of the aggravating factors at issue. *Butler v. Curry*, 538 F.3d at 648.

In this case, part of the testimony presented to Collier's jury was that officers discovered 297.6 grams of ephedrine, the equivalent of approximately 9,920 thirty milligram Sudafed tablets, at the crime scene. (RT at 434-35; 561.) In addition, the jury specifically found Collier guilty of manufacturing methamphetamine that exceeded three gallons of liquid by volume, possession of methamphetamine for sale, maintaining a place for production of methamphetamine and possession of ephedrine or pseudoephedrine with intent to manufacture

21

1  methamphetamine.  (RT at 622-27.)  Accordingly, there is no grave doubt that, if given the

2  opportunity, the jury would have found true beyond a reasonable doubt that Collier possessed a

3  large quantity of contraband, specifically, ephedrine.  Accordingly, the sentencing error was

4  harmless and Collier is not entitled to relief for this claim.

5                                              VI.  CONCLUSION

6              Accordingly, IT IS HEREBY RECOMMENDED that the District Court issue an

7  order: granting the petition for writ of habeas corpus with respect to petitioner's claim that there

8  was insufficient evidence supported his conviction on Count III, a violation of California Health

9  and Safety Code section 11366.5(a); reversing conviction on Count II;[5] and denying the petition

10  with respect to all other grounds.

11             These findings and recommendations are submitted to the United States District

12  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

13  one days after being served with these findings and recommendations, any party may file written

14  objections with the court and serve a copy on all parties.  Such a document should be captioned

15  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

16  shall be served and filed within seven days after service of the objections.  Failure to file

17  objections within the specified time may waive a party's right to appeal the District Court's

18  order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

19  DATED: March 25, 2011

20                                    *Charlene H. Sorrentino*

21                                    CHARLENE H. SORRENTINO
                                      UNITED STATES MAGISTRATE JUDGE

22

23

24

25  _____

26      [5] Because Collier's sentence of 48 months on Count III was stayed by the trial court, it
    appears that reversal on Count III might not affect the duration of his sentence.